UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CASE NO. 23-cr-216-ACR |
| v. | : | |
| | : | |
| ANDREW YAVOICH, | : | |
| | : | |
| Defendant. | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Andrew Yavoich to 60 days of home confinement, 60 hours of community service, $500 in restitution and a $10 special assessment.

I.   **Introduction**

Defendant Andrew Yavoich, a 40-year-old bank employee with an MBA and degrees in criminal justice, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Defendant Yavoich pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). On January 6, Yavoich approached the Capitol Building alongside a large mob. Upon nearing the door he would eventually enter, Yavoich could see that destroyed door, and officers inside desperately attempting to keep rioters out of the building. Instead of leaving, Yavoich took out his cell phone to record the event. Paying no heed to the numerous warning signs that he should not be there, Yavoich meandered through the Capitol building for roughly 17 minutes before finally deciding to exit.

The Court must consider that Yavoich's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. *See United States v. Thomas Fee*, 1:21-cr-00131 (JDB), Tr. 04/01/2022 at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution. And that assault was intended by many and by the mob at large in general to interfere with an important democratic processes of this country. I cannot ignore that, cannot pull this misdemeanor out of that context.") (statement of Judge Bates). His actions and those of his fellow rioters enabled the breach of the Capitol, threatened the lives of the police officers, legislators and their staffs, and disrupted the certification vote for several hours. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

Here, the facts and circumstances of Yavoich's crime support a sentence of 60 days of home confinement, 60 hours of community service, and $500 in restitution.

## II. Factual and Procedural Background

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 18 (Statement of Offense), at 1-3. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent— contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Yavoich's conduct and behavior on January 6.

*Defendant Yavoich's Role in the January 6, 2021 Attack on the Capitol*

Living in nearby Delaware, Yavoich attended numerous rallies held in Washington, D.C. following the 2020 Presidential Election. Yavoich traveled to D.C. for rallies on November 14, and December 12, 2020, and at these rallies, Yavoich met other individuals with whom he developed an online correspondence.

On January 6, 2021, Yavoich attended the "Stop the Steal" rally at the Ellipse; however, he left before all the speakers were done because he was not feeling well. After a few hours at his hotel, Yavoich was awoken by one of his acquaintances from prior rallies and was told that the crowd was moving toward the Capitol. Yavoich decided to join them.

Wearing a black jacket over a red hoodie and a red "Keep America Great" baseball hat and carrying an American flag on a flagpole and a second flag in his jacket pocket, Yavoich traveled through what was, until the mob overwhelmed the barriers and workers evacuated, an active construction site on the West Front of the Capitol. Although police had likely recently retreated from the area by the time Yavoich arrived, they had been deploying munitions for more than an hour in that location and the air was redolent with traces of pepper spray and other less than lethal munitions. As he followed the crowd right up to the Senate Wing Door, Yavoich passed those overturned barriers. *See* Figure 1.



*Figure 1: Yavoich outside the Senate Wing Door*

Upon nearing the Senate Wing Door, Yavoich could see a destroyed door, and just inside officers desperately attempted to keep rioters out of the building by setting up a makeshift barrier to block the doorway. The spectacle inspired Yavoich and several others around him to raise their phones to record what they were seeing at around 2:43 p.m.



*Figure 2: Yavoich filmed the chaos outside the Senate Wing Door*

Around the same time as Yavoich filmed this struggle, at approximately 2:48 p.m., all cellular devices in the District of Columbia were sent an emergency alert announcing that a city-wide curfew had been imposed starting at 6:00 p.m. Ignoring all warning signs that he should turn around, Yavoich continued forward into the Capitol, entering at approximately 2:49 p.m.



*Figure 3: Yavoich entering into the Capitol ahead of a large mob.*



*Figure 4: Yavoich entering into the Capitol through the door, while others through the window*

After entering, Yavoich headed towards the Crypt, and then attempted to walk back to the Senate Wing Door at 2:59 p.m. The chaos Yavoich saw outside the Capitol continued inside. Walking through the Capitol, Yavoich would have seen rioters entering into a senator's office, heard rioters using megaphones to induce chants, and smelled the smoke from tobacco and marijuana being consumed in the building. *See* Figure 5.



*Figure 5: Yavoich passing by Senator Merkley's Office as property inside is destroyed*

Although Yavoich walked alone through the Capitol building, he did stop at a window to use his phone. *See* Figure 6. Yavoich finally exited the Capitol building through the South Door at 3:06 p.m., roughly 17 minutes after entering and after traversing nearly the entire first floor. *See* Figure 7.



*Figure 6: Yavoich using his phone by a window inside the Capitol*



*Figure 7: Yavoich exited the Capitol at the South Door*



*Figure 5: Yavoich's route through the U.S. Capitol*

*The Charges and Plea Agreement*

On June 7, 2023, the United States charged Yavoich by criminal complaint with violating 18 U.S.C. § 1752(a)(1), entering or remaining in a restricted area; 18 U.S.C. § 1752(a)(2), disorderly or disruptive conduct in a restrict area; 40 U.S.C. § 5104(e)(2)(D), disorderly or disruptive conduct in a Capitol Building or grounds; and 40 U.S.C. § 5104(e)(2)(G), parading, demonstrating, or picketing in a Capitol Building. On June 14, 2023, law enforcement officers arrested him in Wilmington, Delaware.

On July 7, 2023, the United States charged Yavoich by a four-count Information with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), 40 U.S.C.

§ 5104(e)(2)(G). On July 27, 2023, pursuant to a plea agreement, Yavoich pleaded guilty to count four of the Information. By plea agreement, Yavoich agreed to pay $500 in restitution to the Architect of the Capitol.

### III. Statutory Penalties

Yavoich now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement, the Yavoich faces up to six months of imprisonment and a fine of up to $5,000. Yavoich must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. § 1B1.9.

### IV. Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the § 3553(a) factors weigh in favor of a period of home confinement.

#### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while

staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Yavoich's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Yavoich, the absence of violent or destructive acts is not a mitigating factor. Had Yavoich engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Yavoich's case was his reactions to the events happening around him. Yavoich joined other rioters entering the Capitol through an obviously broken door being guarded by a line of riot police with large numbers of the crowd jumping through shattered windows on either side of the door. The air was redolent with the remnants of pepper spray and an alert announcing a curfew was broadcast to the phone he was continuously looking at immediately prior to his entry. The scene made plain that his entry was not allowed, yet he chose to ignore that warning and enter. Despite being surrounded by rioters, Yavoich chose to remain inside the Capitol for roughly 17 minutes. Yavoich made a number of bad decisions on January 6, and the nature and the circumstances of this offense establish the clear need for a sentence of home detention.

B. The History and Characteristics of Yavoich

Yavoich has no prior criminal history. Yavoich's advanced education and experience, particularly his degrees in criminal justice and prior work experience as a security guard and probation officer, also makes his conduct in the present case even more questionable. Yavoich holds an advanced degree in Organization Leadership; however, on January 6, 2021, he instead decided to follow a crowd that was clearly breaking the law. Following his offense, Yavoich was cooperative with law enforcement and has accepted responsibility for his actions, though the

information from the phone that he used was never provided. Moreover, his letter to probation appears to minimize the signals that were available to him, particularly to someone of his training and education, by emphasizing the lack of barriers and "open" door. Although the broken door—surrounded by police and rioters—no longer provided a physical barrier to the defendant's movements, the door could hardly be described as "open."

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually - - should be expect") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be

deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

All Defendants need to understand that their actions on January 6 and any similar actions in the future cannot be tolerated. Yavoich's actions were not violent, but he entered the Capitol contrary to the obvious riotous conditions around him. Yavoich entered through a door that was clearly broken with police that were clearly overrun by the mob. A sentence of home detention is

necessary to ensure that Yavoich learns that he cannot break the law in pursuit of his political goals.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2] This Court must sentence Yavoich based on his own conduct and relevant characteristics but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Yavoich has pleaded guilty to Count Four of the Information, charging him with parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3552(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[ ] in types of charges" is not unwarranted. *United States v Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of

minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom.

*See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v Caleb Jones*, 21-cr-321-JEB, the defendant pled guilty to one count in violation of 40 U.S.C. § 5104(e)(2)(G). In that case, the defendant entered through the same door as Yavoich, and stayed inside the Capitol building for approximately 15 minutes and did not enter any of the rooms. Unlike Yavoich, the defendant in *Jones* also scaled a wall outside of the building in order to get to the Upper West Terrace. Jones was sentenced to two years' probation with 60 days home confinement.

In *United States v Michael Stepakoff*, 211-cr-096-RC, the defendant pled guilty to one count in violation of 40 U.S.C. § 5104(e)(2)(G). In that case, the defendant saw rioters scaling the

walls, and saw other rioters entering the Capitol through broken windows. The defendant entered the Capitol at 3:00 p.m., through the same door as Yavoich. In *Stepakoff*, the defendant exited the building 6 minutes later. Stepakoff was sentenced to 12 months' probation, with 2 months' home confinement.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

V.  **Restitution**

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v Papgno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *See* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C.

§ 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v Anderson*, 545 FF.3d 1072, 1078-79 (D.C. Cir 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Yavoich must pay $500 in restitution, which reflects in part the role Yavoich played in the riot on January 6. Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 14, 2022. *Id*. As of July 2023, the number has been updated to $2,923,080.05. Yavoich's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR. ¶ 64.

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his contribution to the victims' total losses. *See Paroline v United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses").

More specifically, the Court should require Yavoich to pay $500 in restitution for his conviction on Count Four. This amount fairly reflects Yavoich's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution

and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

### VI.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Yavoich to 60 days of home confinement, 60 hours of community service, $500 restitution and a $10 special assessment. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully Submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   /s/ *Adam M. Dreher*
ADAM M. DREHER
Assistant United States Attorney
Michigan Bar No. P79246
601 D. St. N.W.
Washington, D.C. 20530
(202) 252-1706
adam.dreher@usdoj.gov